May it please the Court, Counsel, I'm Lisa Hay of the Federal Defender's Office. This criminal case raises two issues under the Fourth Amendment and one sentencing issue. I represent the defendant, Benny Washington, who was sitting in his lawfully parked car at about 11.30 at night in downtown Portland waiting for his friends when two Portland officers approached him. It was November of 2004, six months after the Portland police had begun distributing the mail. He's approached by one officer and another officer shows up, Your Honor. That's correct. So there's two officers as part of the scene eventually. All right. By the time he's stepping out of the car, both officers are there. Counsel, is it your contention that there was a search at that point or a voluntary encounter? Your Honor, I think the first issue in the case is whether this was a voluntary encounter or whether this was a seizure. And my position is this was a seizure when the officer said to him, what are you doing? And that's because in the setting, in November of 2004, the Portland police ---- It said, can I help you? Your Honor, I think that could have helped to alleviate the coarseness of the situation. Certainly, when an officer ---- Is there a problem? Can I help you? Yes. Again, if an officer had come up to say, good evening, is everything okay? Are you doing okay? May I ask you some questions? All of those formulations are phrases this Court has said offer the possibility of refusal, give the idea that this is a voluntary encounter. He hasn't asked me anything at that point. He just comes up and he says, you know, comes up with his flashlight. And you're right. According to the transcript, he says, what are you doing? He says what? Exactly. Your Honor, he comes up with his flashlight on the defendant, and he says to you ---- I wonder, is there any, you know, suppose he came up and said, with his flashlight just like that, and said, is there a problem? Your Honor, that's ---- Can I help you? What's the qualitative difference between those two scenarios? The one you ---- the one in the back show and the one I'm posing? Well, one of the differences is whether the initial question gives the right of refusal. It implies that the compliance must be followed or not. And I don't ---- He didn't even ask me anything. He just said, what are you doing? That's correct. And, Your Honor, it's hard to ---- hard to assess a situation with one question. I think the whole notion in the Supreme Court and in this Court is the totality of the circumstances. So that's one circumstance. What is the initial response? What is the initial question? In this case, the second question, after what are you doing, the next question is, do you have anything on you that you shouldn't have? Again, that just emphasizes this is not a voluntary encounter. This is a question about incriminating information. And, again, Mr. Washington is not doing anything illegal. The police have no reason to suspect him of any criminal activity. The question is simply, is this voluntary or is this a seizure? Counsel, hasn't the Supreme Court said that police can initiate voluntary encounters, that they can ask, walk up to citizens and ask questions? So what's illegal about that? It's not illegal to walk up and talk to citizens. That's certainly true. The question is whether the totality of the encounter constitutes a seizure or not. And the question ---- the test is very simple. Whether something is a seizure depends on whether a reasonable person would feel they had the right to terminate the encounter and go about their business. Otherwise phrased, whether a person could ignore the police conduct. And in this case, Your Honor, given the situation in Portland in 2004, where the police have been distributing brochures about police shootings of motorists, where people are being told to comply with police officers, given the history in Portland where police officers had shot two unarmed black motorists and killed them, given that this is 1130 at night on a deserted street where there are no witnesses present, where the officer shows up with his flashlight and says, What are you doing? Mr. Washington would not have been reasonable to think he could drive away. No reasonable person in that situation would believe they could ignore the police presence. In fact, that's what Kendra James did a year before. She started up her car, tried to drive away, and she was killed. Your Honor, because this whole situation has to be considered not just at that moment, which I believe is a seizure, but the totality of the moment. After Mr. Washington has been asked, What are you doing? The officer is asking to get out of his car after he says, Sure, you can check me. They say, Get out of your car. They then, with the flashlight on him, direct him with his hands up away from his car, back towards the police car, where they then search him. Only after that whole encounter do the officers ask him for consent to search his car. So you have to consider the full encounter. I think it was a — Go ahead. Is it your position, then, that the consent was involuntary at that point when he consented to search his car? Your Honor, that's the second argument. I think the first argument is that there was a seizure. If there was a seizure in this case, which is if no reasonable person would believe they could disregard the police presence, we don't have to get to the consent to search because the involuntary seizure violated the Fourth Amendment and that tainted any later search. If the court doesn't reach the question of a seizure, the next question is, Was this consent to search the car voluntary? And I think that — There's one other step in there, and that is he gets out of the car, he agrees, or whatever, he consents to the search of his person. Correct. And that's not — you're not challenging that here, as I understand it, nor did you challenge it before the dispute. Right. We didn't make an argument about whether that consent was just acquiescence, whether that was voluntary, because this Court's holdings and the Supreme Court have recognized that even if somebody acquiesces or consents to certain police conduct, that doesn't undermine whether a seizure has occurred. For example, in Calgary, Texas, which I cited in my reply brief, the defendant does say okay when the police officers say, We need to talk to you. But the Supreme Court says the fact that he didn't fight the deputies doesn't mean that this wasn't a seizure. You can look at what happened after he says okay. After he says okay, that defendant was taken to a number of places, eventually got to the police station, and the Supreme Court said no one would believe he was there by choice. So even if the initial encounter when the officer goes up to the window is not a seizure, that initial encounter, if he gets out of the car, even though it's consensual in some way, it is a seizure ultimately. Ultimately, it becomes a seizure because, for example, when somebody says yes, you can check me, do they believe they're consenting to having their hands up, being walked back to the police car and searched? That's not necessarily the same as a check. For example — Did he tell them to put his hands up, or did he do that on his own volition? Your Honor, the officers didn't say they had asked him to do that. That's a question about why his hands were up. The officers, of course, could have said you're not under arrest, you don't need to have your hands up. Right, but I mean you were given the implication that he was required to put his hands up as part of the scenario. I think that when the officer has his flashlight on him and his hands are in the air, the whole situation is coercive. Whether he did that voluntarily, out of fear, out of belief that the officers required that, the officers could have taken steps to decrease the coerciveness, and they didn't. But what requires the officers to do that? Is there any case that you have that would require the officers to do that? Yes, Your Honor. To reassure? Yes, most of the Supreme Court cases. For instance, Florida v. Bostick, which sets the standard, which says of course police can walk up to citizens and ask questions, but the limiting language is so long as the police do not convey a message that compliance with their requests is required. That's the question here. What is being conveyed to the person? And the question about a seizure, of course, is from the perspective of the person who is being seized. A reasonable person. A reasonable person in that perspective. It's not the officer's subjective intent. So, of course, the officer said in this case, oh, he could have rolled his windows up and sat there. But that's not the issue. The question is what would a reasonable person have believed in that situation and what did the officer's actions convey? I have a question for you, Ms. A. Once he consents to be searched, let's say, can we give anything on you? No. Can we check? Do you mind if I check? He says sure, which is ambiguous. Does he mind? But I take it in the context of sure, go ahead and check. So at that point, at that point, can the officer frisk him while he's sitting in his car? Doesn't the officer have to have him get out of the car to check? Your Honor, I don't think the officer testified one way or the other. In the bus situation in Drayton, in the Supreme Court, exactly that happened. The officer said to the defendant, mind if I check you? The defendant said sure, raised his hands, and the officer checked him right where he was seated. So I don't think it's impossible to check somebody who's seated. Okay. Whether the officer could have just checked him if he stepped right out of the car right there, a frisk, would have been another question. But that's not what happened here. The officer moved him away from his car and actually searched him before asking for consent to search the car. I wanted to address briefly also the question of the voluntariness of the consent because I think the district court erred there in not recognizing that that is a subjective test, not an objective test. And the district court never considered the subjective characteristics of Mr. Washington. Mr. Washington said he was nervous. He was scared. His perception is if you ask police questions, they will knock you down. Mr. Washington is somebody who's aware that motorists had been killed in Portland within the last year in this situation. So his subjective intent mattered in that case, and the district court completely ignored that. When you look at the voluntariness of consent, that matters. Your Honor, I'd like to save the rest of my time for rebuttal, if I may. Fine. We'll kick your time up to two minutes for rebuttal. Thank you. We took your time with questions. Mr. Pfeiffer, go ahead. Since we're adding an extra minute for your colleague, if you need another minute, you take it, too. Thank you, Your Honor. I may want to discuss the sentencing issue. She didn't mention it, but I do want to add something about that. This is a question of whether a reasonable person would feel free to terminate this encounter with the police. That's the legal question the court has to deal with. Judge Hagerty did a very good job of making comprehensive, detailed, specific factual findings about what went on. He specifically credited the officers in several instances and discredited the defendant. So we have to take the court's factual findings. Right, but the factual findings that go into the first consideration are very important here. The encounter, according to Judge Hagerty, was courteous and non-aggressive. He specifically found that if the defendant had declined to cooperate, the encounter would have ended. He specifically found there was no use of any force or threat of force, specifically found that the officers did not use emergency lights or siren, which is an important factor in the Chan Jimenez case. It's not present here. He specifically found that the officers did not block the car or impair possible egress of that car. And that's important because even in the cases where the court has found no seizure, such as the ---- Let's just assume, though. I read Judge Hagerty's question, his ruling, very carefully. And I recognize he found that the officers were courteous and whatnot. Well, he did a lot more than that. Well, you know, there was a yelling. But, you know, it's late at night. It's dark. There's a flashlight. You know, would a reasonable person really feel that they're free to just drive away? I think a reasonable person under those circumstances. A reasonable person who's not engaged in any wrongful conduct would just assume, I can just drive away, you know, just ignore this officer. I can just drive away. Well, he didn't do that, so we're dealing with the fact he didn't. He did cooperate, so I don't know. Would a reasonable person think that they're free to just drive away? I think a reasonable person would not feel that he's being seized. And I think that's the important question, whether he ---- The question is whether or not they would feel ---- Right. A reasonable person would feel that they're free to just drive away. Get out of the car and walk away. Well, looking at the cases the court's deciding, we have the three ---- I understand what the case was. I'm just asking, you know ---- No, I'm just saying that the factors that go into those cases deal with similar circumstances the court found they were. Counsel, did Judge Haggerty consider the information that opposing counsel relayed to us regarding the unique circumstances in Portland and how there had been shootings? Was that part of the equation that was argued to the court? It was all argued. It was all presented. It was all on the record. He was there. He heard it all, but he did not mention it in his ---- And I think the court has to give him some consideration here. He lives in Portland. He knows what's going on. He can understand the situation that the individual was facing like anybody could because we all were hearing these stories at the time. But the important question is how do they specifically relate to the facts presented in this encounter? How did the police capitalize on that? There's absolutely no evidence whatsoever that they used anything of that nature to get the defendant to cooperate. In fact, and again, this is where the factual findings are important, they did exactly the opposite. They asked questions. They didn't tell him he was free to leave. They didn't reassure him that this was not an arrest. He was free to leave. This was a voluntary encounter. They didn't do that. No, they did not affirmatively say that you're free to leave. I agree with that. Let's just assume for a minute that the encounter was just a friendly encounter late at night. That's what the court found. He gets out of the car and ducks his pack down. The other officer arrives. Why isn't it by that point a seizure? Just by having a second officer there? Well, if he packs down, gets him out, does a search on him. Why isn't that a seizure at that point? I would also appreciate your, as you answer that, address Ms. Hayes' argument that when he consented to be searched, that they could have searched him sitting in his car. That, from my experience in many years as a prosecutor, I don't know how many police officers would consider that a safe, practical procedure, that simply you cannot do an effective pat-down with somebody sitting down in a car because of the spatial constraints and what have you. I didn't mean to get you off of answering Judge Piazza's question. Yeah, now I've forgotten it. He gets out of the car, and he's over to the side, and he does a pat-down search. He walks him to the side, and then he does a pat-down search, and another officer appears. Why not at that point? Why isn't that a seizure at that point? Why doesn't it move on to a seizure at that point? Just by virtue of the fact that he touched him? The cases don't address that as being, by itself, turning it into a seizure. Well, he also asked him, and then he asked the question, can I search your car? Right. And that's the whole nature of a consensual encounter is that you ask questions, and you ask people to do things in a consensual manner, that if they wanted to, they could refuse to do, and if they did, then it would turn into an unconstitutional seizure, a Fourth Amendment seizure. When he did the little pat-down, and the other officer shows up and scans by the car, in your government's view, that did not amount to any seizure whatsoever? Of a Fourth Amendment nature. And all we can do is look at the case law on that subject, and if the police are going through, and you can virtually, it's not a check-off situation, but you can just check off the things that were non-coercive, non-intrusive, that were done in this case. The mere fact that they did something in response, in which the defendant responded affirmatively to their question, that was asked in simply an open way, does not turn it into a seizure. I've heard of the fact the defendant consented. Otherwise, every consent would be a seizure. Counsel, when Mr. Washington was asked to move away from his car, was that a request? He was asked to move away. What was the language? The officer said, Officer Shaw said, Sir, can you step over here? Now, when Judge Haggerty made his findings, he used the term had. He had him move over. That can be taken two different ways. When you have somebody do something, it can be persuasively or it can be by force. But that's why the judge's findings are so important. He said there was absolutely no evidence in this case of any force or use of force, anything that would indicate that by doing that, he was coercing him into moving. How about show of authority? Well, the show of authority is there by virtue of the fact he's in a uniform with a firearm at his side and what have you. I mean, there's a show of authority by virtue of the fact he's there, but there was nothing to take advantage of that. You have to take advantage of the situation. The test is a reasonably innocent person. You know, I just can't accept the idea that somebody in that position would feel that they're just free to walk away. Well, if that's true, then the same was true in the case of Summers. And the Kim case that involved more officers. It's late at night. Two officers are there. They're all dressed up. They've got the lights going. I'm sure that there are people who think that every time the police talk to them on the street that they feel compelled to talk to them. Counsel, was the Kim case at night? Counsel, was the Kim case at night? Pardon me? Did the Kim case take place at night? No. But the Kim case did involve the police car partially pinning in the vehicle, which we didn't have here. I mean, there are factors that go both ways in these cases. I'm not saying they're all identical, but you have to weigh them, and that's what Judge Hagerty did. Could I address the sentencing thing just for once at one moment? Your Honor. As I said, we'll give you an extra minute or two if you need it, because we're giving Ms. Hayes an extra minute. Thank you. This is a case in which Judge Hagerty sentenced the defendant to 70 months because he had a couple of prior robbery convictions, and the defense made the argument that it overrated or overstated or overrepresented his criminal history. The court rejected that and said specifically that it did not. Now, under 3553A and subsection C, the court has to give some reason for its sentence when it's within the guideline range. Our argument is that when the court said that, it was directly addressing several of the 3553A factors that talk about a defendant's criminal history. And it's not necessary, it wasn't necessary for Judge Hagerty to go down the list of all the 3553A factors. You know, we have an en banc, we grant an en banc review and en banc hearing. Cardi Zavala. Cardi Zavala, and especially Cardi, deals with what the judge must do at the time of sentencing. Right. I know that's under consideration. And then we have Rita Cardi. Clayborn. Rita Clayborn at the Supreme Court. She's also going to address, you know, the whole role of the district court judge in sentencing. Right. The only reason I say this is I didn't argue this as well in the brief as I did the part about the separate findings of the fact order that was issued. But when the court gave that as the reason why he was sentencing him to 70 months, he was commenting upon that particular 3553A factor on the record. The 70 months was within, if I recall, was that a low part of the guidelines range? Yes, it was. I think given the other cases pending, our panel is not likely to get too adventurous on sentencing standards ahead of the Supreme Court. But you should probably use your time on whether the conviction is sustained. Can I take you back to the depression issue? Oh, certainly. Let's assume for a moment there was a seizure at some point along the way, either at the beginning or after he gets out, does the search. In the voluntariness determination by Doug Taggart, he assumed that there was, you know, he had found that there was no seizure. Right. Does it make a difference in the equation? Yes, of course, under Chan Jimenez it does. If you put into that equation that he was seized at that time, doesn't that make a difference in how you assess the voluntariness? Right, that's one of the factors. It's a pretty significant factor, correct? In consent. You know, U.S. v. Mourning has several factors that the Court applied here, and those are discussed in Chan Jimenez, which deals with both the issue of consent and the issue of whether there's a seizure. So if you have a seizure, then it plays into whether there was a consensual, whether there was a valid consent to search, yes. Make a difference, wouldn't it? It would have made a difference in this case, yes, but Judge Haggerty went to great pains to show there never had been a seizure. I understand. Right. Let me ask you one more question. If we were to conclude that in the total circumstances there was a seizure at the point where the appellant was asked to move over to the other car or when the other officer arrived, would the government then say that the consent to search the vehicle was involuntary or was tainted? Again, that goes back to Judge Piazza's question about the effect that has in judging the consent factors. It would be one factor. It wouldn't be automatic. Right, it wouldn't be automatic. That's a pretty significant factor in the case. In that case, sure. Okay, well, we've taken you over your time, and we appreciate the responses. Now, Ms. Hay, you get an extra ---- we're going to put your time up to two minutes. Thank you. I wanted to clarify a few of the factual issues that were raised. About the second officer, I think the facts are clear. He arrived in time to hear Officer Shaw direct Mr. Washington to get out of the car. Significantly, he said he couldn't hear the remaining conversation between Mr. Washington and Officer Shaw because they had been moved away already. So there's no question that Mr. Washington was moved away from the car. The government suggested that he just had him step over here, but I think the fact the second officer couldn't even hear indicates that there was a larger distance that he was moved. In addition, Mr. Washington described specifically how he was moved, and that was confirmed by Officer Pahlke, who watched it. And that was that one officer had the flashlight on Mr. Shaw and was stepping backwards while Mr. Washington was told to follow him, follow me, follow me. So this wasn't a consensual walk next to me as a colleague, as an innocent person, as a United States citizen with rights. This was being directed as a suspect away from his car, and that makes a difference as well. The government suggested that the Summers and Kim's case assist them. I don't think those cases help the government's position at all. In Kim, it was a daylight encounter. There were a number of pedestrians around, and the Supreme Court in Drayton said that when there are onlookers, people who might help you assert your rights, that's something to make the situation less coercive. The DEA agent in Kim was not in uniform, was not in a marched car. That agent is the one who first said, do you mind if I ask you some questions? And this Court said by phrasing the question that way, he left open the right of refusal. That kind of phrasing, that courteous phrasing was not present here, the sense that somebody could refuse. Similarly, in Summers, the defendant was out of his car, and that defendant actually went up to the police officer who had pulled into the parking lot. It was late at night, and the officer wondered what the defendant was doing there. The defendant walked up to the officer and said, may I help you, facetiously, and that's when the encounter started. May I ask you to respond to opposing counsel's position that if we agree with you that there's a seizure, that that's only one factor to consider in determining whether or not the consent to search the car was voluntary? It's true that the seizure is only one factor for the consent, but my position is if you find that a seizure occurred, then all of the evidence has to be suppressed from any of his statements, any of the search of the car, because there was no reasonable suspicion for that seizure. That seizure violated the Fourth Amendment. It's a separate issue. The consent to search the car, whether or not it was voluntary, is a separate issue than whether or not there was a seizure. That's correct. I would argue that anything that resulted from that unconstitutional seizure was tainted because there was no intervening event. There was nothing to separate the consent from the unconstitutional seizure. I think there's a long analysis of that in the other Washington case from this Court from 2004, not this defendant, in which they assessed whether the taint from an unlawful seizure has dissipated, and when they're so close in time, this Court has said there's no dissipation. What's that case? It's U.S. v. Washington. It's cited in my briefs. It's a 2004 case. But seizure is a significant factor in the five factors that we look at. Yes. And if consent is voluntary. If Mr. Washington was seized, that would give this Court a reason to review the voluntariness of consent, not under the clearly erroneous standard, but under a less deferential standard, because the district court erred in its legal reasoning about the seizure, and that's what happened in the Chan-Humanist case, where this Court said, we can review this not quite de novo, perhaps, but with less deference. If Mr. Washington was seized, then a number of the other factors are very relevant. He was not told that he was free to leave, not told that he could refuse consents. The other factors of coercion are present, and again, the subjective perception of the person is relevant for voluntariness of the consent. And in this case, Mr. Washington told us his perception. His perception was he would be harmed if he didn't consent, and that was a reasonable perception in light of the circumstances. We're well over the extra time we gave you. Thank you, Your Honor. Now, if Judge Pius and Judge Paulson have further questions, we'll go on. But otherwise, we should end. Thank you, Your Honor. Okay, thank you. Thank you, sir. We appreciate the expert argument of both counsel. Kathy, could you move that a little closer? Okay. Yeah, move that closer. Thanks. Of the next case on our calendar, and I'll back up. Of the next case on our argument calendar is Poland v. Chertoff.
judges: Guld, Paez, Rawlinson